**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**REED AUTO OF OVERLAND PARK, LLC,**

       **Plaintiff,**

       **v.**

**LANDERS MCLARTY OLATHE KS, LLC,**

       **Defendant.**

**Case No. 2:19-cv-02510-HLT**

## MEMORANDUM AND ORDER

This is a dispute between two competing car dealerships. Plaintiff Reed Auto of Overland Park alleges that Defendant Landers McLarty breached a contract it entered in 2007 with another dealership that later sold its assets to Reed. Part of that agreement was a promise by Landers McLarty not to protest the relocation of certain vehicle lines in the Overland Park sales area for 15 years. About 12 years into that agreement, Landers McLarty filed a protest against Reed's proposed dealership relocation. Reed, asserting itself as a successor to one of the parties to the contract, sued for breach of contract and malicious prosecution.[1]

On September 14-15, 2021, the Court held a bench trial on these claims. The parties submitted additional briefs following trial, Docs. 149-150, and presented closing arguments on October 25, 2021. The Court took the matter under advisement. The Court now makes the following findings of fact and conclusions of law and, for the reasons discussed below, enters judgment for Landers McLarty on both claims.

---

[1] On summary judgment, the Court dismissed alternative contract claims based on Reed's status as an assignee and third-party beneficiary to the contract, as well as a claim for violation of the Michigan Consumer Protection Act. The Court also dismissed Reed Auto Group as a plaintiff. *See* Doc. 96.

# I.    FINDINGS OF FACT[2]

On July 24, 2007, Overland Park, Jeep, Inc. ("OPJ"),[3] Landers McLarty, and DaimlerChrysler Motors Company LLC executed a settlement agreement ("2007 Settlement Agreement"). Plaintiff's Ex. 3. These three entities are defined by the 2007 Settlement Agreement as "the Parties" collectively, or as a "Party" individually. The 2007 Settlement Agreement reflects that "a dispute has arisen between the Parties," namely a protest by OPJ and other dealers challenging the relocation of one of Landers McLarty's dealerships. The purpose of the 2007 Settlement Agreement was to resolve the protest.

Paragraph 1 of the 2007 Settlement Agreement states:

> Landers McLarty agrees not to protest or otherwise challenge any relocation or establishment of any DaimlerChrysler vehicle lines[4] into the Overland Park Sales Area, as defined in Attachment 1 hereto for a period of fifteen (15) years from the date of the execution of this Agreement.

Paragraph 16 addresses successors and assigns:

> This Agreement shall inure to the benefit of and be binding on the successors, assigns, heirs, and legal representatives of the Parties to this Agreement. In the event Landers McLarty enters into any agreement to sell or transfer all or any portion of its stock or assets, then Landers McLarty is required to include in the terms of any such agreement the terms of this Agreement and that the buyer is bound by the terms of this Agreement. Landers McLarty acknowledges that DaimlerChrysler has the right to reject any potential buyer on the sole grounds that Landers McLarty has failed to include a provision in its sale or transfer agreement consistent with this paragraph and that such rejection will constitute good cause to reject the buyer as prospective transferee of Landers McLarty under the then applicable

---

[2]    In accordance with Fed. R. Civ. P. 52(a)(1), the Court finds the following facts based on the testimony at the bench trial and the exhibits, which were all admitted by stipulation except Plaintiff's Exhibit 71, which relates to damages. Because the Court finds Reed was not a successor to a party to the contract, the Court does not reach the issue of damages. For ease of reference, the Court cites only Plaintiff's Exhibit numbers.

[3]    Overland Park Jeep eventually changed its name to Overland Park Ventures, but that name change is not relevant to the issues in this case. Thus, the Court refers to these entities collectively as OPJ.

[4]    In 2007, DaimlerChrysler manufactured the Chrysler, Dodge, and Jeep vehicle lines.

Kansas statute regulating the relations between new vehicle manufacturers and their dealers or any other Kansas statute or common law.

The 2007 Settlement Agreement also includes a provision that entitles the prevailing party to recover reasonable attorneys' fees and costs in connection with any dispute about the agreement. Michigan law governs the 2007 Settlement Agreement.

Norman Vialle was one of the owners of OPJ in 2007. Vialle testified that OPJ protested a proposed relocation of the Olathe Dodge dealership by Landers McLarty. OPJ and Landers McLarty resolved the dispute by entering into the 2007 Settlement Agreement, under which Landers McLarty agreed to not protest in the future if OPJ decided to move its dealership to a location along I-35. Vialle testified that he didn't remember being involved in negotiating the 2007 Settlement Agreement, though it designates him as a representative of OPJ. Vialle testified that the 2007 Settlement Agreement gave OPJ the right to relocate without protest. He also testified that OPJ intended the 2007 Settlement Agreement to benefit anyone to whom OPJ would later sell its dealership.

Randy Reed is employed by Reed Auto Group and is the manager of Reed Auto of Overland Park.[5] In 2017, Vialle contacted Randy and asked if he'd be interested in purchasing the OPJ dealership. At the time of the initial discussions and sale, OPJ was located at 87th and Metcalf in Overland Park, on property leased by OPJ. Randy thought the facility was in decline and was not in a good location. Randy testified that he nevertheless was still interested in purchasing OPJ because it was the franchise for Chrysler, Dodge, Jeep, and Ram vehicle lines in the Overland Park sales area, and he assumed the dealership could be relocated. Vialle had previously investigated

---

[5]   Randy Reed individually is not a party to this case. The Court refers to him as "Randy" when discussing him individually and uses "Reed" to refer to the plaintiff, Reed Auto of Overland Park.

relocating the dealership from the 87th and Metcalf location to a location off I-35. The manufacturer was supportive of the move.

Within the Kansas City metro area "sales locality," there are smaller "sales areas" that each have one dealership assigned to sell new vehicles and perform warranty service work. Sales areas are designated by the manufacturer. Franchise rights from a manufacturer entitle a dealer to be the exclusive dealer in a certain sales area for certain vehicle lines. Reed was interested in being the exclusive dealer in the Overland Park sales area for the Chrysler, Dodge, Jeep, and Ram vehicle lines. By this time, FCA was the manufacturer of the Chrysler, Dodge, Jeep, and Ram vehicle lines, having succeeded DaimlerChrysler. The Overland Park sales area consists primarily of eastern and northern areas of Johnson County, Kansas. Although a dealer can sell a vehicle to anyone, regardless of where they reside, the dealership can only be physically located in its designated sales area.

In 2017, Reed and OPJ entered into an asset purchase agreement ("2017 APA"). *See* Plaintiff's Ex. 23. The 2017 APA states that Reed "wishes to acquire substantially all of the assets of [OPJ] for the purpose of succeeding [OPJ] as the authorized Chrysler, Jeep, Dodge, and Ram dealer at the Dealership Location." In executing the 2017 APA, Reed was not agreeing to purchase any ownership interest in OPJ itself and has never had an ownership stake in OPJ. Rather, Reed was purchasing certain assets owned by OPJ.

The largest asset purchased by Reed in the 2017 APA was the dealership franchise rights, though franchise rights actually come from FCA as the manufacturer of the vehicle lines at issue. In other words, the authority to sell the Chrysler, Dodge, Jeep, and Ram vehicle lines had to come from FCA and not OPJ. But OPJ was essentially selling Reed the ability to become the exclusive dealer of those vehicle lines in the Overland Park sales area.

The 2017 APA also set forth the other assets and liabilities being transferred from OPJ to Reed. Section 1.1(h) of the 2017 APA relates to "Assumed Contracts" and states that Reed agrees to assume OPJ's "rights and obligations arising from and after the Closing Date under only the agreements and contracts listed on the attached ***Schedule 1.1.(h)*** (the **"Assumed Contracts"**)." Schedule 1.1(h) does not list the 2007 Settlement Agreement. Schedule 6.7 of the 2017 APA lists "all currently existing contracts and agreements relating to [OPJ] or [OPJ]'s business which are <u>not</u> being assumed by [Reed] and which are considered Excluded Liabilities." Schedule 6.7 does not list the 2007 Settlement Agreement and also states that "Liabilities under all agreements other than 'Assumed Contracts' are considered Excluded Liabilities." Assets not specifically listed as "Purchased Assets" were retained by OPJ.

Closing on the 2017 APA was contingent on FCA awarding the Overland Park sales area to Reed. FCA conditionally approved the deal between Reed and OPJ, which allowed the deal to close. Reed executed separate sales and service agreements with FCA to sell the designated vehicle lines. Reed also had to separately obtain certain permissions from the state to operate a dealership, including a license and bond, which could not be transferred from OPJ to Reed. Additionally, Reed had to obtain its own financing from financial institutions, obtain utilities in Reed's name from the utility companies, and obtain its own insurance and employee-benefit policies. Reed also obtained its own federal tax and employer numbers.

After completion of the conditional items in the 2017 APA, the deal closed in February 2018, and Reed became the authorized dealer for the Overland Park sales area for the Chrysler, Dodge, Jeep, and Ram vehicle lines. The deal closed on a Thursday, and the next day the dealership looked essentially the same except the sign on the building changed from "Overland Park Jeep" to "Reed Jeep." Reed kept all OPJ's employees except for Vialle, who signed a non-compete

agreement, and an IT manager. Reed purchased all the vehicles that had been on OPJ's lot. A few months after the sale, OPJ dissolved and Vialle retired.

Shortly after signing the 2017 APA, Reed began discussing relocation of the dealership with FCA, who encouraged it. The lease on the dealership building at 87th and Metcalf was going to expire approximately two and a half years after closing, and Reed began exploring different locations. Reed eventually purchased a lot off I-35. FCA thought the new location was a good site, and Vialle had also recommended it as an option. The proposed new location was further away from Landers McLarty's dealership in Olathe than the Metcalf location had been.

Under Kansas law, a dealer can protest another dealer's relocation within a ten-mile radius of its own dealership. Landers McLarty's Olathe Dodge dealership is in the Olathe sales area, which is adjacent to the Overland Park sales area. In 2007, Landers McLarty consolidated some dealerships at a location near the boundary of the Olathe and Overland Park sales areas. Given the ten-mile-radius rule, this move effectively let Landers McLarty protest almost any moves made within the Overland Park sales area.

Reed closed on the property for its intended new location in January 2019. That same month, FCA, on behalf of Reed, provided statutory notice to the state of Reed's intent to relocate. Plaintiff's Ex. 27. At the time, Reed had about a year and a half to be out of the location at 87th and Metcalf, which didn't leave much time to build the new dealership at the new location. When the notice was submitted, Reed did not expect any protests because FCA had said it didn't expect Landers McLarty to protest.

Kevin Lawyer, who works for Landers McLarty, also told Reed on April 9, 2019, that he was not recommending any protest, though he said the decision ultimately was not his to make.

Any delay caused by a protest would have been very problematic for Reed given the ongoing planning for the new location and the expiring lease at the 87th and Metcalf location.

Mike Siegal testified via deposition. Siegal previously worked for FCA and DaimlerChrysler and currently works for a company that resulted from a merger of FCA with another entity. He is responsible for developing the dealer network and for helping dealerships move into new markets.

Siegal testified that he talked with Lawyer about Reed's proposed relocation. Lawyer was concerned with protecting Landers McLarty as one of the largest dealers in the area, but he didn't necessarily express any desire to financially harm Reed by protesting the relocation. Landers McLarty was primarily concerned that the move would put Reed's dealership right in the middle of Landers McLarty's customer base. Shortly before Landers McLarty filed the protest, Siegal and other FCA representatives met with representatives of Landers McLarty in Kansas City. The meeting was prompted by Landers McLarty indicating to FCA that it had changed its mind regarding filing a protest and intended to challenge Reed's proposed relocation after all.

Landers McLarty reached out to FCA to see if it could negotiate some benefits, including remodeling funds or extra inventory, to offset any potential damage imposed by Reed's move. Those discussions were not fruitful, and Landers McLarty ultimately decided to file the notice of protest in mid-April 2019. There was some conflicting testimony about when the current management of Landers McLarty learned about the 2007 Settlement Agreement, but it is undisputed that Landers McLarty was aware of the 2007 Settlement Agreement when it filed the protest.

Landers McLarty was also aware that Reed was facing the expiration of its lease at the Metcalf location. In an email sent to his partners on April 10, 2019, Lawyer stated, in part:

> They are anxious to clear up the matter because any delays from protest will make it impossible for them to be out of their property by May 2020 and that is the real leverage we have here.
>
> They don't know that the owner of that land "Colby Capitol" is also the person leasing my home in Loch Lloyd while building a $6million home around the corner from mine for two years and the penalties for not being off that property would cripple the store. They cannot afford any delays and Chrysler knows it and now so do you.

Plaintiff's Ex. 29 (text as in original).

On April 25, 2019, Landers McLarty filed a notice of protest of Reed's proposed relocation. Plaintiff's Ex. 31. Reed immediately contacted counsel and began preparing a defense.

At the time Landers McLarty filed the protest, Reed was not aware of the 2007 Settlement Agreement. When Vialle was negotiating the 2017 APA, he didn't bring it up because he didn't think relocation of the dealership would be an issue because FCA was supportive of the move. FCA thought there had been an agreement by Landers McLarty to not protest, but it could not immediately locate the document.

Reed subsequently learned about the 2007 Settlement Agreement during a conversation between Randy and Vialle in July 2019, when the subject of the protest came up. Vialle told Randy that Landers McLarty could not protest because it had signed the 2007 Settlement Agreement. Vialle quickly provided a copy to Randy, who immediately sent it to Reed's counsel. OPJ also assigned the 2007 Settlement Agreement to Reed in July 2019, immediately after Reed learned of its existence. Randy was "incensed" when he learned about the 2007 Settlement Agreement because he thought Landers McLarty had put his business in a dire situation by going back on an agreement it had signed.

On July 9, 2019, the day after the conversation with Vialle, Reed's counsel contacted Landers McLarty's counsel, sent the 2007 Settlement Agreement, and requested that Landers

McLarty withdraw the protest and reimburse Reed for damages incurred in defending the protest. Plaintiff's Ex. 38.

Chuck Cummings, the executive vice president of Landers McLarty, testified that Landers McLarty ultimately dismissed the protest on July 12, 2019, shortly after learning OPJ had formally assigned the 2007 Settlement Agreement to Reed on July 9, 2019. Plaintiff's Exs. 36, 37, 40. This, in Landers McLarty's view, made it an enforceable contract by Reed. Until that point, Landers McLarty did not view the 2007 Settlement Agreement as enforceable by Reed. Landers McLarty did not reimburse Reed for the costs of defending the protest between April 25 and July 12.

Cummings testified that Landers McLarty did not view Reed as a successor to OPJ because Reed was a separate LLC, and when a dealership changes hands, the purchaser doesn't purchase the LLC itself, but rather just the assets. Siegal testified to this point as well, stating that when a dealer sells to another dealer, 95 percent of the time it is achieved through an asset purchase agreement.

Randy testified that he believes a successor is "somebody who comes after another," and that Reed is the successor for the Overland Park sales area. He also testified that it made no sense for Vialle to retain any rights under the 2007 Settlement Agreement because he was not going to continue operating a dealership in the Overland Park sales area. FCA has never told Landers McLarty that it did anything wrong or that it breached the 2007 Settlement Agreement by filing the protest.

## II.     CONCLUSIONS OF LAW

### A.     Breach of Contract

Reed's first claim against Landers McLarty is for breach of contract. Traditionally, only parties to a contract may enforce it. *Osprey-Troy Officentre L.L.C. v. World All. Fin. Corp.*, 822

F. Supp. 2d 700, 705 (E.D. Mich. 2011). Reed concedes it is not a party to the 2007 Settlement Agreement but maintains it may enforce the contract because it is a successor under paragraph 16. Thus, the issue is whether Reed is a "successor" under the 2007 Settlement Agreement.[6]

The key to contract interpretation is to ascertain the intention of the parties. *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 811 (6th Cir. 2007). "Where a contract is unambiguous on its face, extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself." *Id.* at 812; *see also Redding v. Blodgett*, 2021 WL 1236110, at *4 (Mich. Ct. App. 2021) (explaining that "[u]nambiguous contractual language must be enforced as written").

"[C]ontractual terms must be construed in context and in accordance with their commonly used meanings." *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 778 N.W.2d 275, 280 (Mich. Ct. App. 2009). If a word is not defined in a contract, the dictionary may be consulted. *See id.* at 279-80. But any terms should still be construed in the context of the specific contract. *Redding*, 2021 WL 1236110, at *4; *Durasevic v. Grange Ins. Co. of Mich.*, 328 F. Supp. 3d 770, 776 (E.D. Mich. 2018). "[C]ourts should not apply a dictionary definition that would not fit the context of the contract or would require forced construction." *Redding*, 2021 WL 1236110, at *4.

At issue is the following sentence of paragraph 16 of the 2007 Settlement Agreement: "This Agreement shall inure to the benefit of and be binding on the successors, assigns, heirs, and legal representatives of the Parties to this Agreement." "Successor" is not defined in the 2007 Settlement Agreement. Michigan courts have relied on Black's Law Dictionary to define "successor" as "[s]omeone who succeeds to the office, rights, responsibilities, or place of another; one who

---

[6]   The parties also dispute whether Reed has incurred damages as the result of any alleged breach. But that issue is only relevant if Reed is a successor under the 2007 Settlement Agreement.

replaces or follows a predecessor," as well as more colloquial definitions of "someone or something that comes after another person or thing" or "someone or something that follows and takes the job, place, or position that was held by another." *Redding*, 2021 WL 1236110, at *5 (brackets in original). Both parties generally agree with this definition of successor. But they disagree about the capacity in which someone must be a successor. In other words, the primary dispute between the parties is not whether the 2007 Settlement Agreement extends to successors, but successors of <u>what</u>.

The plain language of the 2007 Settlement Agreement answers this question. Paragraph 16 states: "This Agreement shall inure to the benefit of and be binding on the <u>successors</u>, assigns, heirs, and legal representatives <u>of the Parties</u> to this Agreement" (emphasis added). The introductory paragraph of the 2007 Settlement Agreement defines "Parties" or "Party" as referring to the three signatories: OPJ, Landers McLarty, and DaimlerChrysler. "Party" or "Parties" is used throughout the 2007 Settlement Agreement to refer only to the entities signing it. There is no other reasonable interpretation of this language, nor is there any ambiguity. *See Ososki v. St. Paul Surplus Lines Ins. Co.*, 162 F. Supp. 2d 714, 717 (E.D. Mich. 2001) (noting that a contract term is ambiguous when it is "susceptible to two or more <u>reasonable</u> interpretations"). Thus, under the plain and unambiguous language of the 2007 Settlement Agreement, Reed must be a successor <u>of OPJ</u> to have privity to enforce the agreement.

The facts do not support a conclusion that Reed is a successor to OPJ. The 2017 APA did not effect a merger between Reed and OPJ, and there was no transfer of stock or ownership. Both remained separate business entities. OPJ subsequently dissolved, but only months after the 2017 APA closed. Reed only purchased certain assets and liabilities belonging to OPJ. The 2007 Settlement Agreement was never mentioned or discussed. Reed eventually began operating the

dealership in its own name. This required Reed to satisfy several conditions, including getting awarded the franchise directly from FCA, signing various sales and service agreements with FCA, getting licensed by the state, obtaining financing from financial institutions, and establishing various contracts in its own name. None of this came from OPJ.

Reed makes no real argument to contradict these facts. In fact, Reed does not meaningfully argue that it is a successor to OPJ. Rather, it argues that the plain meaning of the term successor in paragraph 16 is successor as the manufacturer-approved dealer for the Overland Park sales area. *See* Doc. 150 at 18. It then focuses its factual analysis on that question. Reed supports its interpretation of the word "successor" by arguing that, "[g]oing forward, the only entities that could benefit under the Settlement Agreement are those seeking to establish or relocate a dealership into the Overland Park sales Area." *Id.* at 11. Because establishing or relocating a dealership is a right limited under state law to manufacturer-approved dealers, it follows for Reed that successor as used in the 2007 Settlement Agreement must mean "to take the place of, replace, or follow as the manufacturer-approved dealer for that sales area." *See id.* at 11-12. This interpretation is not supported—and is in fact contradicted by—the plain and unambiguous language of 2007 Settlement Agreement. The Court also sees two additional problems with this logic.

First, this interpretation would render other language in the agreement superfluous. In addition to stating that the 2007 Settlement Agreement is binding on the successors, assigns, heirs, and legal representatives of the "Parties," paragraph 16 also includes additional requirements for Landers McLarty. Specifically, "[i]n the event Landers McLarty enters into any agreement to sell or transfer all or any portion of its stock or assets, then Landers McLarty is required to include in the terms of any such agreement the terms of this Agreement and that the buyer is bound by the

terms of this Agreement." In other words, the 2007 Settlement Agreement specifically provides

that, should Landers McLarty sell its dealership, including through an asset purchase agreement

much like the one that occurred between OPJ and Reed, it would be required to specifically include

the obligations of the 2007 Settlement Agreement in any such transaction. But if the 2007

Settlement Agreement defined successor to automatically mean a successor <u>dealership to a sales</u>

<u>area</u>, as Reed suggests, this additional language binding Landers McLarty would not have been

needed. *See Cherry v. Am. Country Ins. Co.*, 449 F. Supp. 3d 701, 710 (E.D. Mich. 2020) ("The

construction rules are straightforward: effectuate the intent of the parties; determine the intent from

the words used; consider the words in context; ascribe common meanings to undefined contract

terms; <u>and relegate no term to insignificance</u>." (emphasis added)). To the contrary, the inclusion

of this provision suggests that a subsequent dealership who purchases assets from one of the parties

to the 2007 Settlement Agreement is not automatically considered a "successor" and is not bound

by the agreement absent a specific provision in the asset purchase agreement.[7]

Second, Reed's interpretation of "successor" is based on the fact that the only entities that

could benefit under the 2007 Settlement Agreement are dealerships seeking to establish or relocate

a dealership in the Overland Park sales area, and thus "successor" must be construed to mean one

who takes the place of or follows as the manufacturer-approved dealer for the sales area. Doc. 150

at 11-12. Reed's argument on this point seems to be a reconfigured argument that Reed is a third-

party beneficiary under the 2007 Settlement Agreement—an argument the Court rejected on

summary judgment. Specifically, the Court has already found that the 2007 Settlement Agreement

does not contain any promise by Landers McLarty to do or refrain from doing anything for the

benefit of other dealers relocating in the Overland Park sales area. *See* Doc. 96 at 17. Certainly,

[7]   Notably, there was no such provision in the 2017 APA between Reed and OPJ.

13

other dealerships might benefit from Landers McLarty abstaining from filing a protest. But as the Court previously held, an incidental benefit to a third party is not enough to confer third-party beneficiary status. *See Osprey-Troy Officentre*, 822 F. Supp. 2d at 706. The same would be true for dealers who succeed as the manufacturer-approved dealer in the sales area. That incidental benefit is not reason enough to write language into the 2007 Settlement Agreement.

Ultimately, while there is evidence that Reed succeeded OPJ as the FCA-approved dealer for the Overland Park sales area, there is no evidence that Reed succeeded OPJ within the meaning of the contract.[8] Accordingly, Reed cannot enforce the 2007 Settlement Agreement against Landers McLarty, and its breach-of-contract claim fails.

### B.  Malicious Prosecution

A malicious prosecution claim under Kansas law requires a plaintiff to prove: (1) initiation of a proceeding; (2) without probable cause; (3) done with malice by the defendant; (4) termination of the proceeding in the plaintiff's favor; and (5) damages sustained by the plaintiff. *Good v. Bd. of Cnty. Comm'rs*, 331 F. Supp. 2d 1315, 1328 (D. Kan. 2004).

At the oral argument after the trial, Reed acknowledged that its malicious-prosecution claim must fail for want of probable cause if the Court finds it is not a successor to the 2007

---

[8]  The Court does not find "successors . . . . of the Parties to this Agreement" to be ambiguous and thus does not need to resort to extrinsic evidence to construe this provision. But even if it did, the Court does not find that there is sufficient evidence to demonstrate that the parties to the 2007 Settlement Agreement considered it to be enforceable by any subsequent manufacturer-approved dealer in the Overland Park sales area. Vialle testified at trial that OPJ intended the 2007 Settlement Agreement to benefit anyone to whom OPJ would later sell its dealership, but he also testified that he didn't remember being involved in negotiating the 2007 Settlement Agreement. It was also never mentioned during the negotiation of the 2017 APA even though OPJ, Reed, and FCA all contemplated that the dealership would be relocated from the Metcalf location. There was also evidence that Landers McLarty did not believe Reed had standing to enforce the contract because it did not view Reed as a successor to the agreement. Reed challenges this belief because Landers McLarty dropped the protest as soon as Reed confronted Landers McLarty with a copy of the 2007 Settlement Agreement. But the testimony was that Landers McLarty dropped the protest only after OPJ attempted to <u>assign</u> the 2007 Settlement Agreement to Reed in July 2009, which is an important distinction as this Court has previously held.

Settlement Agreement. Because the Court has found that Reed was not a successor to OPJ as defined by the 2007 Settlement Agreement, Reed's malicious-prosecution claim fails.

Even if Reed had shown it was a successor under the 2007 Settlement Agreement, its malicious-prosecution claim would fail for alternative reasons. Probable cause is judged from "the facts and circumstances as they appeared to [the defendant] when the action was commenced." *Holick v. Burkhart*, 388 F. Supp. 3d 1370, 1382 (D. Kan. 2019). It exists where a party "reasonably believes in the existence of the facts upon which the claim is based" and "correctly or reasonably believes that under those facts the claim may be valid under the applicable law." *Id.* (quoting Restatement (Second) of Torts § 675). Under the facts of this case, and given the extensive litigation this issue has spawned, the Court finds that Landers McLarty at the very least had a reasonable basis to believe Reed was not a party that could enforce the 2007 Settlement Agreement, and that the protest otherwise had a reasonable factual basis.[9]

Additionally, malice requires that a defendant "acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based." *Id.* at 1379. Here, the Court finds that Reed has not demonstrated that Landers McLarty acted with malice in filing the notice of protest. The Court acknowledges Lawyer's email and agrees that he used troubling language. But the evidence at trial demonstrated that Landers McLarty was primarily motivated by protecting its own business, and not by harming Reed. Landers McLarty waited a few months to take any action and initially attempted to seek offsets from FCA to counter any financial impact that Reed's relocation may have had on Landers McLarty's dealership. Only when that proved unfruitful did Landers McLarty file its protest. At most, Landers McLarty's

---

[9]   Reed does not argue that the protest was invalid for reasons other than that it was contrary to the 2007 Settlement Agreement.

action was done to protect its own interest, not to harm Reed. Under these facts, the Court cannot find malice. *See Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 327 (6th Cir. 2014) ("The record, however, does not support any such inference: Rockwood acted for business reasons, not out of malice.").

Accordingly, the Court enters judgment in favor of Landers McLarty on Reed's malicious-prosecution claim.

## III.    CONCLUSION

The Court acknowledges that this has been a hard-fought case and both sides have expended <u>considerable</u> resources in trying to vindicate their respective positions. The Court also recognizes that Reed genuinely believes Landers McLarty acted with malice to hurt its business. And the Court understands Reed's indignation regarding Landers McLarty's actions and its reasons for filing suit. But no explanation was offered about why the 2007 Settlement Agreement didn't come up during the due diligence phase of the 2017 APA. And including the 2007 Settlement Agreement in the 2017 APA would have likely avoided this litigation altogether. But it wasn't. And given the facts presented at trial and the plain language of the 2007 Settlement Agreement, Reed's breach-of-contract claim fails because it is not a successor to OPJ. And because Reed cannot establish breach of contract, its malicious-prosecution claim fails on the probable-cause element and on the malice element.

THE COURT THEREFORE ORDERS that judgment is entered in favor of Defendant Landers McLarty.

IT IS SO ORDERED.

Dated: November 9, 2021                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE